UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

ILANA KOPMAR, *et al.*,

                Plaintiffs,

       -v-

THE ASSOCIATION OF LEGAL AID
ATTORNEYS, AMALGAMATED
LOCAL UNION 2325 OF THE
INTERNATIONAL UNION, UNITED
AUTOMOBILE AEROSPACE AND
AGRICULTURAL IMPLEMENT
WORKERS OF AMERICA (UAW),
AFL-CIO, *et al.*,

                Defendants.

24-CV-5158 (JPO)

OPINION AND ORDER

J. PAUL OETKEN, District Judge:

      Plaintiffs, who are public interest lawyers in the greater New York City area, bring this suit alleging violations of Title VII of the Civil Rights Act of 1964 ("Title VII"), the Labor-Management Reporting and Disclosure Act of 1959 ("LMRDA"), the New York State Human Rights Law ("NYSHRL"), and the New York City Human Rights Law ("NYCHRL").  Before the Court is Defendants' motion to dismiss all claims.

      Plaintiffs allege that their local chapter of the Association of Legal Aid Attorneys[1] ("ALAA"), unlawfully retaliated against Plaintiffs for suing in New York state court to prevent the ALAA from promulgating a resolution that Plaintiffs viewed as antisemitic.  Plaintiffs allege that Defendants' retaliatory countermeasures infringed on Plaintiffs' protected rights to protest discrimination, file lawsuits, and speak freely.

---

[1] The full name of the union is the Association of Legal Aid Attorneys Amalgamated Local Union 2325 of the International Union, United Automobile Aerospace and Agricultural Implement Workers of America ("UAW"), AFL-CIO.

As explained below, Plaintiffs have not stated retaliation claims under Title VII, the NYSHRL, or the NYCHRL, because their state-court lawsuit did not oppose any discrimination made unlawful by those statutes. However, Plaintiffs have stated claims under the LMRDA, at least as to the ALAA and members of its Amalgamated Council. The LMRDA protects Plaintiffs' right to freedom of expression, as well as their right to sue, largely irrespective of the content being expressed. Thus, whether or not Plaintiffs' state-court lawsuit opposed actionable discrimination, the ALAA and its officers were barred from disciplining Plaintiffs in retaliation for that lawsuit.

For those reasons and the ones that follow, Defendants' motion to dismiss is granted in part and denied in part.

## I. Background

### A. Factual Background

The following facts are taken from Plaintiffs' complaint and are presumed true for purposes of this opinion. *See Fink v. Time Warner Cable*, 714 F.3d 739, 740-41 (2d Cir. 2013). Plaintiffs are attorneys employed by the Legal Aid Society of Nassau County (ECF No. 47 ("SAC") ¶¶ 27-29) and are "rank-and-file" members of the ALAA (Mem. at 8-9). Defendants include the ALAA, individual "ALAA officers and members of the ALAA's Amalgamated Council" (the "Amalgamated Council Defendants") (Mem. at 9), and the four rank-and-file ALAA members who filed disciplinary charges against Plaintiffs (the "Charging Defendants") (SAC ¶¶ 34-45).

The ALAA, a "union for legal and social service workers" in the New York City metropolitan area, has approximately 3,000 members and collective-bargaining agreements with 30 non-profit organizations. (*Id.* ¶¶ 110-11 (quoting the ALAA website).) As a member organization of the UAW, the ALAA operates subject to the UAW constitution and to its own

by-laws.  (*Id.* ¶¶ 112-13.)  The ALAA has a complex organizational structure with multiple

governing entities.  The ALAA's membership itself is the "the highest authority within the

union" and "has authority to determine critical issues such as ratify contracts, strike, return to

work, set dues, and elect Officers and Delegates, including Delegates to UAW Constitutional

Conventions."  (*Id.* ¶ 114.)  The membership as a whole elects "Constitutional Officers,"

including a "President, Financial Secretary-Treasurer, Recording Secretary, three Trustees,

Sergeant-at-Arms, and Guide."  (*Id.* ¶ 115.)  The membership is also subdivided into "chapters"

corresponding to each of the non-profit organizations with which the ALAA has agreements.

(*Id.* ¶ 110.)  A "Joint Council" comprises the Constitutional Officers, along with "representatives

of each of the ALAA chapters proportionate to the size of their membership according to an

articulated formula within the by-laws."  (*Id.* ¶ 116.)  The Joint Council is responsible for

"approving arbitration of grievances and conducting union committee elections."  (*Id.*)  The Joint

Council also has the power to put proposed resolutions to a membership vote.  (*Id.* ¶¶ 139-41.)

Finally, there is an "Amalgamated Council" comprising the Constitutional Officers and

representatives from each of the ALAA chapters, but with different representatives than those on

the Joint Council.  (*Id.* ¶ 117.)  The Amalgamated Council can make certain financial decisions,

hire and fire local staff, and manage the ALAA's real-estate portfolio, in addition to other

specific duties delegated to it by the Joint Council.  (*Id.* ¶ 118.)  Relevant to this case, such

delegated powers include the power to review internal disciplinary charges filed by members

against other members and determine whether such charges are "proper" to proceed to trial under

the UAW constitution.  (*Id.* ¶¶ 48, 163, 168.)

On November 14, 2023, the Joint Council submitted to the membership a resolution (the

"Resolution") that Plaintiffs characterize as "an 1,147-word diatribe against Israel."  (Opp. at 9;

*see also* SAC ¶¶ 134-41.)  Two days after the Joint Council approved the Resolution for a vote, and one day before the membership voted, Plaintiffs sought a temporary restraining order in New York state court.  (SAC ¶¶ 142-43.)  On November 17, following a conference call with the parties to that action, the state court issued a TRO blocking the vote, and ordered the parties to return for a follow-up call on November 21.  (*Id.* ¶ 146.)  After that call, the court extended the TRO for up to thirty days.  (*Id.* ¶¶ 147-48.)  The ALAA then removed the action to the United States District Court for the Eastern District of New York.  *See Clarke v. The Ass'n of Legal Aid Att'ys*, No. 23-CV-8869 (E.D.N.Y. Dec. 1, 2023), ECF No. 1 at 1.  That court held a lengthy hearing on December 15, 2023, at which the court granted Defendants' motion to dissolve the TRO.  *See Clarke*, No. 23-CV-8869 (E.D.N.Y. Dec. 15, 2023), ECF No. 38 at 79; *see also id.* at 46 (noting that "the case and the motion at issue raise really important issues that I've thought deeply about").  Plaintiffs then elected not to further pursue a preliminary injunction, *Clarke*, No. 23-CV-8869 (E.D.N.Y. Dec. 19, 2023), ECF No. 36, and voluntarily dismissed the action, *Clarke*, No. 23-CV-8869 (E.D.N.Y. Dec. 22, 2023), ECF No. 37.

While their lawsuit was pending in state court, Plaintiffs allege, they were subjected to retaliatory harassment by their fellow union members, including in the form of messages on an internal union email listserv called "Gaggle."  (SAC ¶¶ 152-57.)  Plaintiffs allege that this harassment campaign escalated to the filing of formal union disciplinary charges on November 21, 2023 by ALAA members Danielle Welch, Gerald Koch, Eva Stevenson, and Candace Graff.  (SAC ¶¶ 158-61.)  The charges alleged that Plaintiffs' lawsuit had "contravene[d] internal union decisions," "chill[ed] free speech," publicized ALAA members' personal information, and "unfairly characterize[d]" ALAA members as "antisemitic," and that Plaintiffs had failed to exhaust the ALAA's internal remedies before filing their lawsuit.  (*Id.* ¶ 161.)  Multiple layers of

the ALAA's governing entities then reviewed these charges.  First, the Constitutional Officers "approved forwarding the charges to the Amalgamated Council for approval."  (*Id.* ¶ 162.)  The Amalgamated Council next "found that [the charges] [we]re proper and a trial [would] be held." (*Id.* ¶ 163 (quoting the Amalgamated Council).)  The Joint Council then commenced the process of selecting a jury to hear the trial.  (*Id.* ¶ 166.)

On January 22, 2024, Plaintiffs appealed the Amalgamated Council's approval of the charges to the UAW International Executive Board.  (*Id.* ¶ 167.)  On June 4, 2024, while their appeal was pending, Plaintiffs filed charges with the Equal Employment Opportunity Commission ("EEOC") and requested right-to-sue letters, which they received on August 1, 2024.  (*Id.* ¶¶ 25-26.)  On June 26, 2024, the International Executive Board summarily affirmed the Amalgamated Council's decision to approve the charges.  (*Id.* ¶ 168.)  Plaintiffs again appealed, this time to the UAW Public Review Board ("PRB"), "the highest arbiter within the UAW."  (Opp. at 12; *see also* ECF No. 64-1.)  The PRB held a hearing on January 31, 2025, and dismissed the charges on March 17, 2025.  (ECF No. 64 at 2; ECF No. 64-1 at 10, 14.)

On July 8, 2024, while the PRB's decision was pending, Plaintiffs filed the instant lawsuit.  (*See* ECF No. 1.)  When Plaintiffs filed their second amended complaint on September 13, 2024, the PRB proceedings were still pending, which allegedly "had the effect of chilling [P]laintiffs' engaging in protected activity in opposing the ALAA's continued discriminatory anti-Semitic environment."  (SAC ¶ 170.)  Specifically, Plaintiffs allege that they "limited their involvement in ALAA communications and activities" and were pressured into "rationing the exercise of their rights to participate in the ALAA's democratic processes and speak their mind on matters before the ALAA for fear of further jeopardizing their expulsion."  (*Id.* ¶ 171.)  As an example, Plaintiffs allege that they felt pressure to avoid engaging in pro-Israel advocacy (*id.*

¶¶ 172-73), and that the ALAA hid its own activities from Plaintiffs in order to restrict their ability to participate (*id.* ¶¶ 177-81).  Because the operative complaint was filed before the PRB dismissed the disciplinary charges, the complaint does not discuss any specific examples of retaliation or harassment that occurred after the charges were dismissed.

### B.    Procedural Background

The original complaint in this action was filed on July 8, 2024 (ECF No. 1), and a second amended complaint was filed on September 13, 2024 (SAC).  Defendants filed a motion to dismiss on October 28, 2024 (ECF No. 53), along with a supporting memorandum of law (ECF No. 54 ("Mem.")) and affidavit (ECF No. 55 ("Aff.")).  Plaintiffs opposed the motion to dismiss on January 24, 2025 (ECF No. 60 ("Opp.")), and Defendants replied in support of the motion on March 3, 2025 (ECF No. 63 ("Reply")).  Plaintiffs filed a letter notifying the Court of the PRB's decision dismissing the disciplinary charges on March 20, 2025.  (ECF No. 64.)

## II.    Legal Standard

To survive a motion to dismiss under Federal Rule of Civil Procedure 12(b)(6), a plaintiff must allege "enough facts to state a claim to relief that is plausible on its face."  *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007).  A claim is plausible "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."  *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).  This means that a complaint is properly dismissed where "the allegations in a complaint, however true, could not raise a claim of entitlement to relief."  *Twombly*, 550 U.S. at 558.  A complaint is also properly dismissed "where the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct."  *Iqbal*, 556 U.S. at 679.  While "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice," *id.* at 678, the Court must draw "all inferences in the light most favorable to the non-moving party . . . ."  *In re NYSE Specialists*

*Sec. Litig.*, 503 F.3d 89, 95 (2d Cir. 2007). Determining whether a complaint states a plausible claim is ultimately a "context-specific task that requires the reviewing court to draw on its judicial experience and common sense." *Iqbal*, 556 U.S. at 679.

## III. Discussion

### A. Claims Pursuant to Anti-Discrimination Statutes

Plaintiffs assert retaliation claims against the union under Title VII, 42 U.S.C. § 2000e-3(a), and the NYSHRL, N.Y. Exec. Law § 296(1)(e); aiding-and-abetting claims against the individual defendants under the NYSHRL, N.Y. Exec. Law § 296(6); and retaliation claims against both the union and the individual defendants under the NYCHRL, N.Y.C. Admin. Code § 8-107(7). While the standards for stating a retaliation claim under the NYSHRL and NYCHRL are more lenient than under Title VII in some respects, *see Reach v. Healthfirst, Inc.*, No. 23-CV-8085, 2024 WL 4493769, at *8 (S.D.N.Y. Oct. 15, 2024), each of the three statutes requires that the retaliation be because of a plaintiff's prior conduct that opposed or challenged something prohibited by that statute. *See* 42 U.S.C. § 2000e-3(a) (barring retaliation "because [one] has opposed any practice made an unlawful employment practice by this subchapter"); N.Y. Exec. Law § 296(1)(e) (barring retaliation "because [one] has opposed any practices forbidden under this article"); N.Y.C. Admin. Code § 8-107(7) (barring retaliation "because [one] has . . . opposed any practice forbidden under this chapter").

Accordingly, "only complaints about conduct that is at least arguably prohibited by the employment discrimination laws can qualify as protected activity." *Trotter v. Nat'l Football League*, 737 F. Supp. 3d 172, 183 (S.D.N.Y. 2024). Even complaints that involve the rights and interests of individuals based on protected identity attributes do not constitute protected activity for purposes of a retaliation claim if they do not involve allegations of unlawful discrimination. *See, e.g.*, *Manoharan v. Columbia Univ. Coll. of Physicians & Surgeons*, 842 F.2d 590, 594 (2d

Cir. 1988) (complaints about a lack of affirmative action were not protected activity because "affirmative action in employment practices is not required by Title VII"). "[A]n employee is not required to mention discrimination or use particular language in order for a complaint to qualify as protected activity." *Trotter*, 737 F. Supp. 3d at 185 (quotation marks omitted). However, where an employment practice "clearly could not have been unlawful," there can be no retaliation claim based on challenges to that practice. *Id.* at 188.

According to Plaintiffs, their state-court lawsuit included a claim for breach of the ALAA's duty of fair representation based on the Resolution and a "campaign of anti-Semitic hatred, harassment, and retaliation surrounding" it. (SAC ¶¶ 149, 185.)  While it is indeed true that "a union violates Title VII when it breaches its duty of fair representation because of race, color, religion, sex, or national origin," *see Agosto v. Corr. Officers Benev. Ass'n*, 107 F. Supp. 2d 294, 304 (S.D.N.Y. 2000) (collecting cases), Defendants disagree that the state-court lawsuit challenged such discrimination.  Rather, Defendants argue that the lawsuit alleged only speculative and generalized harm to Plaintiffs' careers and reputations, not impermissible discrimination.  (Mem. at 27.)  In support, Defendants attach Plaintiffs' filings from the lawsuit (ECF No. 55-1 ("Lawsuit")), which the Court considers because they are integral to the complaint, *see Cortec Indus., Inc. v. Sum Holding L.P.*, 949 F.2d 42, 47 (2d Cir. 1991).

The Court agrees with Defendants that Plaintiffs' state-court lawsuit cannot be reasonably read as stating discrimination claims under Title VII, the NYSHRL, or the NYCHRL. As with retaliation claims, discrimination claims under the three statutes are analyzed somewhat differently, with the NYSHRL and NYCHRL being more plaintiff-friendly than their federal counterpart.  *See Reach*, 2024 WL 4493769, at *7.  However, under all three, "the ultimate question" is "discrimination *vel non*"—that is "whether the defendant intentionally discriminated

against the plaintiff." *St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 518 (1993) (quoting *U.S. Postal Serv. Bd. of Governors v. Aikens*, 460 U.S. 711, 714-15 (1983)).[2]

First, Plaintiffs' state-court lawsuit did not allege the minimal facts needed to state an ordinary discrimination claim under Title VII, the NYSHRL, or the NYCHRL. Under Title VII, pleading disparate treatment would have required identifying an "adverse employment action," such as "termination of employment, a demotion evidenced by a decrease in wage or salary, a less distinguished title, a material loss of benefits, [or] significantly diminished material responsibilities." *Joseph v. Leavitt*, 465 F.3d 87, 90 (2d Cir. 2006). Pleading hostile environment under that statute would have required alleging "severe or pervasive" "intimidation, ridicule, and insult." *Cf. Harris v. Forklift Sys, Inc.*, 510 U.S. 17, 21, 23 (1993) (quotation marks omitted).

With respect to the NYSHRL and NYCHRL, Plaintiffs needed only plead that they were treated "less well" on account of their membership in a protected class, and that such treatment was motivated by "discriminatory intent." *See Moore v. Hadestown Broadway LLC*, 722 F. Supp. 3d 229, 245 (S.D.N.Y. 2024) (disparate treatment); *Reach*, 2024 WL 4493769, at *6-7 (workplace hostility). But "[w]hile the NYCHRL [and NYSHRL] [are] indeed reviewed independently from and more liberally than federal . . . discrimination claims, [they] still require[] a showing of some evidence from which discrimination can be inferred." *Lugo v. City of New York*, 518 F. App'x 28, 30 (2d Cir. 2013) (summary order) (quotation marks omitted); *see also Ward v. Cohen Media Publ'ns LLC*, No. 22-CV-6431, 2023 WL 5353342, at *15 (S.D.N.Y. Aug. 21, 2023) ("Plaintiff must still plead sufficient facts to infer a causal connection, and even

---

[2] At the pleading stage, plaintiffs need only provide "plausible support [for] a minimal inference of discriminatory motivation," but the question is still ultimately one of intentional discrimination. *See Littlejohn v. City of New York*, 795 F.3d 297, 311 (2d Cir. 2015).

under the more lenient requirements of the NYCHRL [and NYSHRL], plaintiff's claims must be more than conclusory or speculative to survive a motion to dismiss." (cleaned up)).

The bottom line is that "Title VII, NYSHRL, and NYCHRL provide causes of action . . . only for instances of discrimination that adversely affect an employee's [or union member's] employment [or membership]." *Soloviev v. Goldstein*, 104 F. Supp. 3d 232, 247 (E.D.N.Y. 2015); *see also Cruz v. 32BJ SEIU*, No. 22-2753, 2024 WL 676237, at *2-3 (2d Cir. Feb. 20, 2024) (applying the same standards to claims against a union); *Bostock v. Clayton County, Georgia*, 590 U.S. 644, 658 (2020) (Title VII does not reach instances of "discriminating categorically rather than individually" because "[t]he statute . . . tells us three times . . . that our focus should be on individuals, not groups."). Here, whatever the pleading standard, Plaintiffs have failed to identify any instances in which they were treated poorly relative to their colleagues, much less that any such treatment was because of race, ethnicity, religion, or any other protected attribute.

The complaint and request for a TRO in the state-court lawsuit included only spare references to antisemitism, and only in the context of describing the "contents" of the Resolution. (*See, e.g.*, Lawsuit at 13, ¶ 33; *id.* at 15, ¶ 40 ("venomously antisemitic statement/Resolution"); *id.* at 16, ¶ 43 ("the Resolution is . . . *perceived* by members of the public at large as overtly antisemitic"); *id.* at 16, ¶ 45 ("overtly antisemitic nature of the contents of the Resolution").) Plaintiffs' primary argument was not that they were being discriminated against, but rather that the Resolution would "deprive Plaintiffs of the ability to avoid irreconcilable conflicts of interest and the appearance thereof with present and future prospective clients, creating an impossible ethical dilemma for them and thereby making it impossible for them to properly do their job as Public Defenders." (*Id.* at 7, ¶ 9.) Similarly, Plaintiffs claimed that they would "suffer harm in

their relationship with their employer NCLAS, their employer's continued ability to employ them, their relationships with current and/or future clients, their professional standing, and their reputation among potential future employers." (*Id.* at 11, ¶ 26.)  At no point did Plaintiffs argue that the Resolution had only been adopted because the ALAA discounted or repressed the views of its Jewish members, in fact almost exclusively using the word Jewish when referring to Plaintiffs' *clients* who might be offended by the Resolution (*see, e.g.*, *id.* at 6, ¶ 8), and to Jewish colleagues with whom Plaintiffs' professional reputations might suffer (*id.* at 12, ¶ 32). Reviewing these allegations, the Court sees nothing alleging differential treatment of Plaintiffs because they are Jewish, or based on any other protected status.

Nor did Plaintiffs plead disparate impact, as they failed to "demonstrate a significant adverse impact on some protected class." *Collette v. St. Luke's Roosevelt Hosp.*, 132 F. Supp. 2d 256, 276 (S.D.N.Y. 2001).  "[Title VII] places an initial burden on the plaintiff to show that the specific factor challenged under the disparate impact model results in the discriminatory impact." *Lopez v. Metro. Life Ins. Co.*, 930 F.2d 157, 159 (2d Cir.1991); *see also Trezza v. The Hartford, Inc.*, 98-CV-2205, 1998 WL 912101, at *7 (S.D.N.Y. December 30, 1998) ("[A] plaintiff must identify a specific employment practice and provide evidence sufficient to raise an inference that the identified practice caused significant adverse effects on the protected group."); *Assistant Deputy Wardens/Deputy Wardens Ass'n v. City of New York*, No. 14-CV-4308, 2019 WL 4015119, at *2 (E.D.N.Y. Aug. 26, 2019) (dismissing NYCHRL disparate impact claims for failure to identify adverse impacts, notwithstanding the City statute's more "lenient standard"). Plaintiffs did not identify or provide facts showing any currently existing disparity among ALAA members causally linked to the Resolution.  Instead, they offered only "marginal and speculative . . . predictions of post-[Resolution] implementation events."  *Cf. Loc. Unions 20,*

*135, 257, 296, 531, 740, 902, 1456 of United Bhd. of Carpenters & Joiners of Am. v. United Bhd. of Carpenters & Joiners of Am.*, No. 97-CV-5538, 1997 WL 630179, at *12 (S.D.N.Y. Oct. 9, 1997), *aff'd*, 131 F.3d 131 (2d Cir. 1997) (rejecting disparate impact allegations).  In fact, the state-court complaint expressly disclaimed such disparate impacts, instead arguing that the Resolution would harm all of the ALAA's members by creating conflicts of interest with their clients.  (Lawsuit at 7-8, ¶¶ 9-12; *id*. at 13, ¶ 33 (arguing that "the stench of extreme, rank antisemitism will attach to each and every attorney at NCLAS who is a member of UAW ALAA Local 2325").)

Moreover, because the ALAA's Resolution was political speech on a matter of public concern, this case is "rife with First Amendment overtones."  *Cf.  Gartenberg v. Cooper Union for the Advancement of Sci. & Art*, 765 F. Supp. 3d 245, 260 (S.D.N.Y. 2025) (cleaned up). While it is true that "invidious private discrimination . . . has never been accorded affirmative constitutional protections," *Hishon v. King & Spalding*, 467 U.S. 69, 78 n.4 (1984) (quotation marks omitted), Title VII, like the NYSHRL and NYCHRL,[3] nonetheless must respect "the fundamental principle that governments have 'no power to restrict expression because of its message, its ideas, its subject matter, or its content,'" *Nat'l Inst. of Fam. & Life Advocs. v. Becerra*, 585 U.S. 755, 766 (2018) (quoting *Reed v. Town of Gilbert*, 576 U.S. 155, 163 (2015)). When speech involves matters of "public concern"—as the current debates about Israel and Palestine surely do—it is "entitled to 'special protection' under the First Amendment" and generally "cannot be restricted simply because it is upsetting or arouses contempt."  *Snyder v. Phelps*, 562 U.S. 443, 453, 458 (2011) (quoting *Connick v. Myers*, 461 U.S. 138, 146 (1983)).

---

[3] *Cf. 303 Creative LLC v. Elenis*, 600 U.S. 570 (2023) (subjecting state and local antidiscrimination laws to First Amendment scrutiny).

Balancing the various interests involved, at least one court in this district has refused to extend federal antidiscrimination protections to "pure political speech," including when such speech is alleged to be antisemitic by dint of its criticism of Israel and Zionism. *See Gartenberg*, 765 F. Supp. 3d at 264.[4] Although *Gartenberg* concerned Title VI rather than Title VII, the Court finds Judge Cronan's reasoning in that case persuasive and, because similar principles apply to both statutes, adopts it here. While antidiscrimination law may regulate speech in the form of threats, intimidation, and other "well-defined and narrowly limited classes," "which are of such slight social value as a step to truth that any benefit that may be derived from them is clearly outweighed by the social interest in order and morality," it may not "single out for opprobrium only that speech directed toward . . . specified disfavored topics." *Virginia v. Black*, 538 U.S. 343, 358 (2003) (quotation marks omitted).

Here, the Resolution constitutes pure political speech. It advocates *inter alia* for "governments to stop all military funding for Israel," "public support for Palestinian freedom," "human rights," criticism of "the Israeli Defense Minister calling all Gazans 'human animals'," an end to "widespread bombing" in Gaza, criticism of "US military aid," "humanitarian relief . . . including relief to address Palestinian homelessness, refugee displacement, prisoners rights, criminal defense, rights of parents and children, and access to food, clean water, medical services, schools and essential utilities," and similar political demands. (ECF No. 55-2 at 1-2 (emphasis omitted).) At times, the Resolution uses intense and provocative rhetoric, including referring to Israel's policies in Gaza as "a state of siege," "a colonial apartheid occupation," "ethnic cleansing," and "genocide." (*Id.* at 1-3 (emphasis omitted).) The Resolution then lists a

---

[4] As the court in *Gartenberg* observed, precedent in this area is limited "[i]n part because harassment claims are rarely based on pure political speech." 765 F.Supp.3d at 262.

series of demands, including an "immediate ceasefire" and return of basic services to Gaza, "an

end to Israeli apartheid and the occupation and blockade of [Palestine]," opposition to all

"military aid," endorsement of the "Boycott, Divestment, and Sanctions movement," a

prohibition of non-profit contributions to "illegal Israeli settlements," and "the right of all

Palestinian refugees to return to their homeland."  (*Id.* at 4 (emphasis omitted).)  The Resolution

also "denounce[s] . . . Islamophobic attacks and antisemitic threats."  (*Id.* at 3 (emphasis

omitted).)  The Resolution does not use the words "Zionism" or "Zionist."  (*See id.*)

Such a document falls squarely within the realm of protected political speech.  It

criticizes a series of policies with which its drafters disagree.  While it grapples with an

admittedly charged political issue, it neither identifies nor targets any individual or group on the

basis of race, ethnicity, religion, or nationality.  And it includes an express denunciation of

antisemitic violence.  Reading antidiscrimination laws to prohibit the voicing of views critical of

a foreign state, or support thereof, would raise serious doubts about their constitutionality, which

the Court must avoid.  *See Boos v. Barry*, 485 U.S. 312, 331 (1988) ("[F]ederal courts have the

duty to avoid constitutional difficulties . . . if such a construction is fairly possible.").  While the

Court does not doubt that Plaintiffs were sincerely upset upon reading the Resolution, the fact

that speech may arouse intense negative reactions does not allow the government to restrict it.

*See 303 Creative LLC v. Elenis*, 600 U.S. 570, 586 (2023) ("The First Amendment protects an

individual's right to speak his mind regardless of whether the government considers his speech

sensible and well intentioned or deeply 'misguided,' and likely to cause 'anguish' or

'incalculable grief.'" (quoting *Hurley v. Irish-Am. Gay, Lesbian & Bisexual Grp. of Bos.*, 515

U.S. 557, 574 (1995), and *Snyder*, 562 U.S. at 456)).  Because Plaintiffs' state-court lawsuit

14

challenged speech that the antidiscrimination laws may not constitutionally prohibit, their lawsuit cannot constitute protected activity under those laws.

It is true that Plaintiffs later filed a "Supplemental Affirmation" in their state-court case listing allegedly offensive Gaggle messages sent by ALAA members.  (Lawsuit at 27-32.)  But even if those messages were discriminatory, they did not precede Plaintiffs' initial lawsuit, nor can they reasonably be understood as the basis for the complaint.  (*Cf. id.* ¶ 5 ("I seek to advise the Court as to the full text of the remarkable and hateful screeds that were broadly circulated by ALAA constituent members and leadership, upon their having become aware of the filing of the Plaintiffs' Summons & Complaint . . . .").)  Rather, they are further examples of what Plaintiffs allege to be retaliation for their lawsuit, which are actionable under the antidiscrimination laws only if they relate back to prior protected activity.  *See McSweeney v. Cohen*, No. 24-CV-01503, --- F. Supp. 3d ----, 2025 WL 966022, at *39 (S.D.N.Y. Mar. 31, 2025) ("Plaintiff's conclusory allegation that she engaged in protected activity is insufficient because the factual allegations of the FAC establish that she made no complaint of sex-based misconduct before the alleged adverse employment actions.").  The mere fact that one experienced retaliation after engaging in some conduct cannot, after the fact, transform that conduct into protected activity; to hold otherwise would effectively collapse the distinct protected activity and adverse employment action inquiries into one.  If Plaintiffs believe that the Gaggle messages themselves were discriminatory, Plaintiffs could challenge them under the antidiscrimination laws' core provisions, and those claims would be subject to those provisions' more stringent pleading standards.  *Cf. Gelin v. Geithner*, No. 06-CV-10176, 2009 WL 804144, at *20 (S.D.N.Y. Mar. 26, 2009), *aff'd*, 376 F. App'x 127 (2d Cir. 2010) (summary order).  But Plaintiffs cannot benefit

from the more lenient pleading standards for retaliation claims by using subsequent backlash to retroactively convert their earlier lawsuit into protected activity.

Furthermore, even assuming that Plaintiffs' state-court lawsuit opposed the Gaggle messages, those messages are not actionable discrimination for the same reasons that the Resolution itself is not.  The messages include a plea for union members not to reveal internal communications to the public (Lawsuit at 34-35), a link to an external source about the death toll in Gaza (*id.* at 37), and expressions of support for the Resolution (*id.* at 41).  Another message includes a protest slogan—"From the river to the sea!" (*id.*)—and a final message reads, "I will never have camaraderie with Zionists" (*id.* at 39).  As with the Resolution, these messages constitute spirited debate over a timely and salient political issue.  They do not "go[] beyond mere criticism of Israeli government policy or of Zionist ideology" or "send[] a message that Jews as a class do not belong in Israel while justifying and encouraging violence against those Jews who do live there."  *Cf. Gartenberg*, 765 F. Supp. 3d at 268.  Nor were they communicated by defacing property or by "a mob of protestors" forcibly obstructing public spaces while seeking out specific targets for harassment.  *Cf. id.* at 271-73 (imposing liability based on allegations that "[went] beyond identifying instances of pure political speech").  To the contrary, the Gaggle messages are examples of expression "fairly considered as relating to any matter of political, social, or other concern to the community," "communicated in a manner reasonably calculated to contribute to an ongoing public debate of considerable political significance."  *Id.* at 271 (quoting *Snyder*, 562 U.S. at 453).

Plaintiffs object that they needed only have a "reasonable belief" that they were protesting conduct prohibited by the antidiscrimination statutes.  *Cf. Galdieri-Ambrosini v. Nat'l Realty & Dev. Corp.*, 136 F.3d 276, 292 (2d Cir. 1998); *McMenemy v. City of Rochester*, 241

F.3d 279, 285 (2d Cir. 2001). But failure to plead facts that create a "basis for a rational finding" of discrimination necessarily means that such a belief is not "reasonable," even if it is genuine. *Galdieri-Ambrosini*, 136 F.3d at 292. "A plaintiff's belief on this point is not reasonable simply because he or she complains of something that appears to be discrimination in some form." *Kelly v. Howard I. Shapiro & Assocs. Consulting Eng'rs, P.C.*, 716 F.3d 10, 15 (2d Cir. 2013) (affirming dismissal); *see also Yan v. Ziba Mode Inc.*, No. 15-CV-47, 2016 WL 1276456, at *6 (S.D.N.Y. Mar. 29, 2016) ("The objective reasonableness of an employee's belief that the employer has violated Title VII must be measured against existing substantive law, because a failure to do so would eviscerate the objective component of our reasonableness inquiry." (quotation marks omitted)). Even the NYCHRL, which is broader than its federal counterpart, "does not 'operate as a general civility code,'" and therefore does not reach offensive conduct that falls short of an unlawful employment practice. *Cf. Sosa v. Loc. Staff, LLC*, 618 F. App'x 19, 20 (2d Cir. 2015) (summary order) (quoting *Williams v. N.Y.C. Hous. Auth.*, 872 N.Y.S.2d 27, 40-41 (1st Dep't 2009)).

Because one cannot reasonably read Plaintiffs' state-court lawsuit as stating claims under Title VII, the NYSHRL, or the NYCHRL, Defendants' response to that lawsuit cannot form the basis of a retaliation claim under those statutes. And, because Plaintiffs have not stated a retaliation claim at the entity level under the NYSHRL, there can be no aiding and abetting liability under that statute either. *See Sanchez v. L'Oreal USA, Inc.,* No. 21-CV-3229, 2022 WL 1556402, at *6 (S.D.N.Y. May 17, 2022).

### B.    Claims Pursuant to the LMRDA

Plaintiffs have, however, stated claims pursuant to the LMRDA. Section 101 of the LMRDA, 29 U.S.C. § 411, enumerates certain rights that all union members shall have, including the right to sue, *id.* § 411(a)(4), and the right to freedom of expression, *id.* § 411(a)(2).

Section 609 makes it unlawful for a union to "fine, suspend, expel, or otherwise discipline" any member for exercising such rights, *id.* § 529, and Section 102 creates a civil right of action for violation of either Section 101 or Section 609, *id.* § 412.

As the Second Circuit has explained, "[t]he LMRDA was enacted to encourage democratic self-governance in unions and to curb widespread abuses and corruption among union leadership." *Maddalone v. Loc. 17, United Bhd. of Carpenters & Joiners of Am.*, 152 F.3d 178, 183 (2d Cir. 1998). Thus, the LMRDA's protections have been interpreted flexibly to apply "when a dominant group strives to stifle dissent and efforts at reform." *Id.* (quotation marks omitted). At the same time, the LMRDA does not reach "ad hoc personal retaliation" or purely "personal vendettas," instead applying only to "calculated and deliberate scheme[s] to discourage dissent." *Id.* at 185 (quotation marks omitted).

Here, whether viewed as "infringement" of Plaintiffs' Section 101 rights, or as "discipline" prohibited by Section 609, the ALAA may be liable if the charges against Plaintiffs were based on Plaintiffs' protected conduct.[5] Members of the ALAA "filed charges and initiated expulsion proceedings against plaintiffs" (SAC ¶ 18), and the ALAA defended the propriety of those charges against Plaintiffs' appeals until Plaintiffs finally prevailed before the PRB (ECF No. 64 at 2). That is sufficient to state at least an infringement claim, and likely a discipline claim as well, as to the union. *See Quinn v. Chiofalo*, No. 03-CV-1312, 2003 WL 22952859, at

---

[5] *Cf. Brenner v. Loc. 514, United Bhd. of Carpenters & Joiners of Am.*, 927 F.2d 1283, 1298 (3d Cir. 1991) ("A litigant may successfully seek redress under section 102 for an infringement of these LMRDA rights even if no unlawful 'discipline' is shown." (quoting *Guidry v. Int'l Union of Operating Eng'rs Loc. 406*, 907 F.2d 1491, 1493 (5th Cir. 1990)); *accord Schermerhorn v. Loc. 100, Transp. Workers Union of Am., AFL-CIO*, 91 F.3d 316, 324 (2d Cir. 1996) (approving of jury instructions stating that "where discipline is *sought* against a union member for both speech and conduct as part of one charge . . . the charged party's free speech rights under LMRDA have been violated" (emphasis added)).

*6 (E.D.N.Y. Aug. 26, 2003) ("[T]he mere initiation of retaliatory disciplinary proceedings can

form the basis of a free speech claim . . . even when no discipline ultimately results . . . .

Although the charges were dropped . . . it is a reasonable inference at this stage of the litigation

that the threat of punishment hanging over plaintiffs' heads for many months could have had a

substantial chilling effect on plaintiffs' and other unions members' exercise of their free speech

rights." (quotation marks omitted)); *see also DeCarlo v. Salamone*, 977 F. Supp. 617, 624

(W.D.N.Y. 1997) ("[T]he Local 85 defendants violated DeCarlo's free speech rights under

Section 101(a)(2) by charging and prosecuting him for slander and libel, despite the fact that the

charges ultimately were dismissed.").

The individual defendants, however, argue that they are not liable under the LMRDA,

either because they merely discharged their ordinary duties to the union (the Amalgamated

Council Defendants) or because they filed the charges in their individual capacities (the

Charging Defendants).

Regarding the Amalgamated Council Defendants, the Court disagrees. Section 609

expressly contemplates liability for officers, agents, and employees of labor unions, and while

Section 102 expressly names only labor organizations, the Second Circuit has long held that such

suits may be brought against individual defendants. *See Morrissey v. Nat'l Mar. Union of Am.*,

544 F.2d 19, 24 (2d Cir. 1976). Furthermore, "liability [is not] limited to their acts within the

scope of their authority," but rather extends to any "union official who aids abets, instigates, or

directs a wrongful use of union power to deprive a member of his rights." *Rosario v.

Amalgamated Ladies' Garment Cutters' Union, Loc. 10, I.L.G.W.U.*, 605 F.2d 1228, 1246 (2d

Cir. 1979); *Cotter v. Helmer*, No. 88-CV-5710, 1990 WL 103980, at *4 (S.D.N.Y. July 17, 1990)

(same); *Commer v. McEntee*, No. 00-CV-7913, 2006 WL 3262494, at *12 (S.D.N.Y. Nov. 9,

2006) (same); *Schermerhorn*, 91 F.3d at 324 (reiterating *Rosario*'s language about aiding and abetting liability). The complaint here adequately pleads conduct—approving of allegedly unlawful disciplinary charges and allowing them to proceed to a trial—that falls within the scope of "instigat[ing] or direct[ing] a . . . use of union power," or at the very least aiding and abetting the use of such power. *Cf. id.* Plaintiffs allege that each of the named members of the Amalgamated Council voted to approve the charges. (SAC ¶ 164.) Plaintiffs also allege that the Amalgamated Council "deliberat[ed]" on the charges, and that there exists "substantial email correspondence amongst the ALAA's elected officers and Amalgamated Council members concerning the charges." (*Id.* ¶ 176.) Whether the councilmembers approved the charges in good faith hinges on their motivations and what can be inferred from their exercise of discretionary judgment. "[I]t can easily be seen that the question is fraught with contested issues of material fact," and is not appropriate for resolution on a motion to dismiss. *Cf. Berg v. Watson*, 417 F. Supp. 806, 812 (S.D.N.Y. 1976).

Conversely, Defendants are correct that liability for violating Section 101 of the LMRDA extends only to individuals acting "under color of union authority." *Morrissey*, 544 F.2d at 24. The Charging Defendants are therefore not liable under the LMRDA, as they are not union officials and were not acting as agents of the union.

"The principal reason for the LMRDA was to correct widespread abuses of power and instances of corruption by union officials, and to encourage democratic self-government in unions." *Franza v. Int'l Bhd. of Teamsters, Loc. 671*, 869 F.2d 41, 44 (2d Cir.1989); *see also Guzman v. Bevona*, 90 F.3d 641, 649 (2d Cir. 1996) ("[Courts] fashion federal law consistent with the aims of the LMRDA."). The law's statement of purposes, consistent with this interpretation, discusses regulation only of "labor organizations" and "their officers and

representatives."  29 U.S.C. § 401.  The enforcement provisions of the law do extend liability

beyond labor organizations themselves.  *See Morrissey*, 544 F.2d at 24 ("Nothing in [the

LMRDA's] language indicates that only a labor organization may be sued."); 29 U.S.C. § 412

(implicitly contemplating suits against individuals by separately limiting venue for suits against

organizations); 29 U.S.C. § 529 (prohibiting certain conduct by "any officer, agent, shop

steward, or other representative of a labor organization, or any employee thereof" and specifying

that enforcement is governed by 29 U.S.C. § 412).  But "[t]he uniform current of authority in this

Circuit has been to limit the jurisdiction of the District Courts under the [LMRDA] to suits based

upon allegations that a labor organization or officer or agent thereof acting in his official

capacity violated the terms of the Act."  *Thompson v. N.Y. Cent. R.R. Co.*, 361 F.2d 137, 145 (2d

Cir. 1966); *see also Dilacio v. N.Y.C. Dist. Council of the United Bhd. of Carpenters & Joiners

of Am.*, 593 F. Supp. 2d 571, 576 (S.D.N.Y. 2008) (quoting *Thompson*); *Morrissey*, 544 F.2d at

24 ("[Section 102] extends to suits against individual defendants, at least if it is shown that they

were acting under color of union authority.").

Even if "[t]he 'acting under color of union authority' language" may serve "to extend

liability to *non-union* officials" (Opp. at 22 (emphasis added)), it also advances the purposes of

the LMRDA more broadly:  It prevents members' expression from being chilled by the threat of

federal lawsuits, *cf. Helmer v. Briody*, 759 F. Supp. 170, 177 (S.D.N.Y. 1991) (noting that such

protection does not ordinarily extend to union officials), and promotes the federal judiciary's

well-established "policy of non-interference in the context of labor union disputes," *see Bennett

v. Saunders*, No. 99-CV-0854, 1999 WL 529539, at *2 (S.D.N.Y. July 23, 1999) (collecting

cases).  "When a member assumes a union office, the office can imbue the member's speech

[and actions] with additional significance," and union officials therefore may bear "increased

responsibility" even when acting in their capacities as mere members. *See Helmer*, 759 F. Supp. at 177 (brackets omitted) (quoting *Dolan v. Transp. Workers Union*, 746 F.2d 733, 742 (11th Cir. 1984)). But while union officials may sometimes be sued based on actions taken in their individual capacities, and union members may be sued when acting on behalf of a union, the Court is unaware of any cases in this Circuit imposing LMRDA liability on mere union members acting in their individual capacities. *See, e.g.*, *Dilacio*, 593 F. Supp. 2d at 576 (no liability for union member who was not an official or agent of the union and did not aid or abet an independent violation); *Farrell v. Hellen*, No. 03-CV-4083, 2004 WL 433802, at *5 (S.D.N.Y. Mar. 10, 2004) (Francis, Mag. J.) (similar).[6]

Plaintiffs' primary counterargument is that the Second Circuit has expanded LMRDA liability to encompass "wrongful acts, including those beyond the scope of [an official's] authority." (Opp. at 22 (quoting *Rosario*, 605 F.2d at 1246).) But *Rosario* is best read as imposing liability only on union officials acting *ultra vires*, not on non-officials. 605 F.2d at

---

[6] The only close case is *Cotter v. Helmer*, which involved a long-running feud between officials in a local chapter of the Utility Workers Union of America. 1990 WL 103980, at *1. The involved officials, including Michael Cotter and Henry Helmer, filed a series of internal union charges against one another, which in turn led to federal court cases. *See id*; *Helmer*, 759 F. Supp. at 170. Allowing Cotter's lawsuit to proceed, the district court acknowledged that Helmer had not filed the internal union charges in his capacity as an official, but still held that "[the] charges, and the disciplinary proceedings which followed, were exercises of union power." *Cotter*, 1990 WL 103980, at *4. Thus, regardless of whether "Helmer made the[] charges in his official capacity or as an individual member of the union," LMRDA liability attached because Helmer "must have acted within the union structure, for only those within the union may bring disciplinary charges against another union member." *Id*. Despite this language, though, the Court allowed Cotter to amend the complaint to clarify that Helmer was being sued in his official capacity. *Id*. Later, a second district court explained that Helmer's filing of charges did not constitute protected speech under the LMRDA precisely because his status as a union official, rather than a mere member, "br[ought] with it increased responsibility" regardless of whether "his office . . . grant[ed] him any special authority to bring charges." *Helmer*, 759 F.Supp. at 177. Together, these cases are best interpreted not as imposing liability on a union member for filing disciplinary charges, but as illustrating that union officials are subject to LMRDA liability in part because of their status as officials.

1246 ("Nor, in the case of union officials, should liability be limited to their acts within the scope of their authority."). And while Plaintiffs are correct that Defendants fail to identify any case in the post-*Rosario* era expressly limiting liability to officials, Plaintiffs have not identified any cases involving non-officials. (*Cf.* Opp. at 21-22.)[7]

In any event, whether or not rank-and-file union members can ever face LMRDA charges, Plaintiffs have not adequately stated such a claim here. They have pleaded no details about the union's process for filing disciplinary charges, nor that such charges may be filed only by agents or representatives of the union. To the contrary, the Charging Defendants announced that they filed the charges to show "that members are fighting back to defend ourselves and our union," and clarified that the charges were only being brought by "[a] few of us." (SAC ¶ 18.) Plaintiffs also have not alleged that the Charging Defendants were involved in the prosecution of the charges, or in any way beyond filing them. To impose LMRDA liability based on the allegations here would commit the judiciary to supervising the resolution of routine disputes

---

[7] Plaintiffs point to a case from the Central District of Illinois, in which they argue "claims were . . . sustained against five so-called rank-and-file union members who served on the trial committee that reached a guilty verdict against the plaintiffs." (Opp. at 22.) But the court in that case allowed those claims because the committee members "held . . . official positions . . . with respect to the proceedings against plaintiffs," and their "actions were under color of union authority." *Maxwell v. United Auto., Aerospace & Agr. Implement Workers of Am. (UAW), Loc. No. 1306*, 489 F. Supp. 745, 751 (C.D. Ill. 1980). Conversely, the court dismissed the plaintiffs' claims against union members whose only alleged misconduct was "their giving testimony before the trial committee," as the "giving of opinion testimony by union members who held no official union positions, without more, is an insufficient basis upon which to premise liability." *Id. Maxwell* therefore supports, rather than contradicts, the notion that LMRDA liability attaches only to unions, union officials, or those acting as a union's agents.

The Court is aware of only one case—an unpublished district court opinion from another circuit—declining to dismiss LMRDA charges against union members who were not officials or otherwise acting as agents of the union. *See Babler v. Futhey*, No. 08-CV-912, 2008 WL 3822179, at *8 (N.D. Ohio Aug. 12, 2008). But that case, in addition to being non-binding, did not directly address the question of whether the defendants were acting under color of union authority; instead it rejected the defendants' contention that the filing of disciplinary charges is *per se* protected expression under 29 U.S.C. § 411.

among union members, and would transform the Act from a tool for protecting union democracy and free expression into one for suppressing those values. Absent any binding authority requiring that step, the Court declines to take it.

The only remaining question, then, is whether the ALAA's charges were filed in connection with Plaintiffs' exercise of Section 101 protected rights.[8]

### 1. Right to Sue

Section 101(a)(4) protects union members' "right to sue," and is "designed to give union members the tools to insure the fairness of their union as a representative institution. *Doro v. Sheet Metal Workers' Int'l Ass'n*, 498 F.3d 152, 156 (2d Cir. 2007). As relevant here, the statute bars unions from "limit[ing] the right of any member thereof to institute an action in any court." 29 U.S.C. § 411(a)(4). The protection "is not limited to suits by a union member against the union or its officers," and "appl[ies] to the broad range of disputes and grievances . . . which arise in the context of labor union affairs." *Glasser v. Am. Fed'n of Musicians of U. S. & Canada*, 354 F. Supp. 1, 5 (S.D.N.Y.), *aff'd*, 487 F.2d 1393 (2d Cir. 1973). Although the Second Circuit has not precisely articulated the outer bounds of Section 101(a)(4), other courts have correctly observed that it "is worded in the most inclusive terms," *Moore v. Local 569 of the Int'l Bhd. of Elec. Workers*, 53 F.3d 1054, 1056-57 (9th Cir. 1995), and that "there is nothing in the Act which distinguishes between suits involving members as opposed to employee rights, between suits involving internal as opposed to external union problems, or between suits brought

---

[8] Plaintiffs also point to other forms of retaliation, such as the ALAA's denying them access to other union proceedings. (SAC ¶¶ 177-81.) Because the Court concludes that Plaintiffs have adequately stated claims based on the filing and advancement of formal disciplinary charges, it need not consider the other alleged forms of retaliation at this time.

in good faith as opposed to those brought in bad faith," *Operating Eng'rs Local Union No. 3 v. Burroughs*, 417 F.2d 370, 373 (9th Cir. 1969).

Defendants object that the disciplinary charges were filed against Plaintiffs in part because they "gratuitously and recklessly dox[ed]" other union members, and that the doxing aspect of their lawsuit is not protected by the LMRDA. (Mem. at 24 (emphasis omitted).) Even accepting Defendants' dubious premise that publicly naming parties in a lawsuit constitutes improper "doxing," it would be irrelevant. The union members who filed the charges against Plaintiffs were abundantly clear, both in emails to the union membership and in the text of the charges themselves, that the charges were at least in part based on the lawsuit itself. (SAC ¶¶ 18-19.)[9] Thus, whether the Charging Defendants could have filed charges based solely on the alleged doxing, the charges here may be plausibly construed as based at least in part on Plaintiffs' overall lawsuit.

More broadly, Defendants argue that Plaintiffs' state-court lawsuit was "self-serving" and anti-democratic in nature, and therefore is unprotected by the LMRDA's right-to-sue provision. (Mem. at 23-24.) But the LMRDA is not limited to particular types of lawsuits, nor even to meritorious ones. Indeed, as the Ninth Circuit has explained, the right to sue would be meaningfully degraded "if a member of a union is required to make a pre-suit determination that the union may not discipline him for bringing it because upon a post-suit examination of the matter it will appear to some union official or judge that the member's action was brought in good faith . . . ." *Operating Eng'rs*, 417 F.2d at 373. Moreover, even if Defendants are correct that, at bottom, the state-court lawsuit was nothing more than a bad-faith attempt to cow the

---

[9] In one of those emails, the Charging Defendants appear to have presciently anticipated that their conduct might eventually be scrutinized by courts, writing, "PS: Hello to any judges for whom this becomes an exhibit." (SAC ¶ 18.)

union into submission on particular political issues, the Court could not endorse that view on a motion to dismiss without drawing a host of impermissible inferences in Defendants' favor. On its face, the state-court action purported to assert Plaintiffs' rights to fair representation by the union, and two judges gave Plaintiffs' arguments serious consideration. *See supra* Section I.A. This Court declines to hold that Plaintiffs' claims were so frivolous as a matter of law that they fall entirely beyond the scope of the LMRDA's protections.

Accordingly, Plaintiffs have stated claims under Section 101(a)(4) of the LMRDA.

### 2.    Freedom of Speech

Plaintiffs also allege that the charges interfered with their protected freedom of expression under Section 101(a)(2). Defendants first respond that lawsuits are categorically not protected expression under the LMRDA. (Mem. at 19.) But none of Defendants' cases so hold. Two cases concern non-public cooperation with outside authorities conducting investigations of union corruption. *See Helmer*, 759 F.Supp. at 176-77; *Toner v. United Bhd. of Carpenters*, No. 96-CV-0023, 1999 WL 638602, at *7 (S.D.N.Y. Mar. 30, 1999) (Ellis, Mag. J.) (report and recommendation). Two other cases pertain to complaints or grievances filed with supervisors or union officials, but not communicated to other union members. *See Monaco v. Smith*, No. 00-CV-5845, 2004 WL 203009, at *9 (S.D.N.Y. Feb. 2, 2004); *Leavey v. Int'l Bhd. of Teamsters--Theatrical Teamsters Loc. Union No. 817*, No. 13-CV-0705, 2015 WL 5802901, at *1 (S.D.N.Y. Oct. 5, 2015). And *Lacy v. Highway & Motor Freight Employees, Local 667*, a 1978 case from the Western District of Tennessee, involved the question of whether the restrictive proviso in Section 101(a)(2) applied to the plaintiff's lawsuit, ultimately finding that it did not. 1978 WL 1735, at *4 (W.D. Tenn. Apr. 3, 1978), *aff'd sub nom. Lacy v. Highway & Loc. Motor Freight Emps. Loc. Union No. 667*, 620 F.2d 303 (6th Cir. 1980). The court also emphasized that "when a union member seeks to invoke judicial or administrative processes guaranteed to him under the

labor laws of the United States, the union cannot punish the member for the speech involved in those acts." *Id.* at *3.  These cases do not categorically exclude lawsuits from the scope of expression protected by Section 101(a)(2).

Moreover, even if the act of filing a lawsuit itself is not protected by Section 101(a)(2), the disciplinary charges here also targeted the speech contained in Plaintiffs' lawsuit and the ideas that Plaintiffs sought to communicate.  The charges faulted Plaintiffs for "baselessly and publicly smearing their fellow union siblings as antisemitic."  (SAC ¶ 19.)  Plaintiffs' alleged misconduct, then, was their public advocacy for ideas with which Defendants disagreed, not simply Plaintiffs' recourse to the judicial process.  It is therefore at least plausible to read quotes like this as indicating that Defendants filed and advanced the charges in retaliation for Plaintiffs' protected expression.

Finally, Defendants argue that Plaintiffs violated their responsibility to the union and are therefore unprotected.  (Mem. at 20-21.)  Defendants then cite cases denying protection for frivolous lawsuits, *e.g.*, *Newell v. Wis. Teamsters Joint Council No. 39*, 2008 WL 2356097, at *8 (E.D. Wis. Feb. 21, 2008), defamatory speech, *e.g.*, *Loekle v. Hansen*, 551 F. Supp. 74, 82 (S.D.N.Y. 1982), and purely personal grievances, *e.g.*, *Kazolias v. IBEWLU 363*, 806 F.3d 45, 52-53 (2d Cir. 2015), in order "to protect the integrity of union governance," and not "turn nearly every criticism by a union member regarding an official's conduct . . . into a federal case."  *Id.* (quotation marks omitted).  None of those analogies are applicable here.  Whatever its ultimate merits, Plaintiffs' state-court lawsuit was not manifestly frivolous, was not defamatory, and sought redress for more than just purely private concerns.  Thus, the suit can plausibly be read as an attempt to "publicize [Plaintiffs'] grievances among the membership in an effort to change

union practices," rather than something more akin to a "personal grievance premised on an allegation of an inappropriate job referral." *Cf. Kazolias*, 806 F.3d at 52.

Ultimately, the efforts of all parties in this litigation to cast the legitimate speech of their opponents as violations of legal duties are unfortunate and misguided. The LMRDA creates a statutory scheme that protects the rights of union members to disagree with one another, even vehemently, and sometimes through the vehicle of litigation. While a union and its officers may be liable for wielding the coercive power of the union to suppress speech, union members are not liable to one another for such disagreements. That principle explains both why the Charging Defendants here are not liable under the LMRDA and why Plaintiffs violated no duty to the ALAA by filing their state-court lawsuit.

Accordingly, Plaintiffs have also stated claims under Section 101(a)(2) of the LMRDA.

## IV.    Conclusion

For the foregoing reasons, Defendants' motion to dismiss is GRANTED in part and DENIED in part. The motion is granted as to Plaintiffs' antidiscrimination claims against all parties, and as to Plaintiffs' LMRDA claims against Danielle Welch, Gerald Koch, Eva Stevenson, and Candace Graff. The motion is otherwise denied.

The remaining defendants shall file an answer to the surviving claims within 14 days of the publication of this opinion.

The Clerk of Court is directed to close the motion at Docket Number 53 and to terminate defendants Danielle Welch, Gerald Koch, Eva Stevenson, and Candace Graff as parties.

SO ORDERED.

Dated: July 15, 2025
       New York, New York

_____
                J. PAUL OETKEN
           United States District Judge